**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BOARD OF TRUSTEES OF THE GREATER )
PENNSYLVANIA CARPENTERS' )
MEDICAL PLAN, )
Plaintiff, )
)
    And, )
)
WILLIAM SCHWARTZMILLER, )
Consolidated Plaintiff )
)
    v. )    Civil Action No. 17-1442
)    Senior Judge Nora Barry Fischer
WILLIAM SCHWARTZMILLER and LISA )
SCHWARTZMILLER, )
Defendants, )
)
    And, )
)
GREATER PENNSYLVANIA )
CARPENTERS' PENSION FUND and )
CARPENTERS' COMBINED FUNDS, INC., )
Consolidated Defendants. )

## MEMORANDUM OPINION

### I.    INTRODUCTION

This consolidated ERISA action is before the Court on a non-jury proceeding involving the disputed issue of whether William Schwartzmiller ("William") and Lisa Schwartzmiller ("Lisa") entered into a common law marriage after their 1992 divorce. Per the stipulation of all parties, including the Schwartzmillers, the Board of Trustees of the Greater Pennsylvania Carpenters' Medical Plan ("Medical Plan") and the Greater Pennsylvania Carpenters' Pension Fund and Carpenters' Combined Funds, Inc. ("Pension Fund"), the Court held a one-day bench trial on November 5, 2019 at which time the Schwartzmillers presented evidence while the Medical Plan and Pension Fund observed the proceedings and agreed to be bound by this Court's rulings.

1

(Docket No. 75). The official transcript of the proceedings was produced and the Schwartzmillers filed proposed findings of fact and conclusions of law and responses thereto. (Docket Nos. 91; 94; 98-101). After careful consideration of the parties' positions, and for the following reasons, the Court finds that Lisa demonstrated by clear and convincing evidence that she and William entered into a valid common law remarriage in October of 1993.

## II. LEGAL STANDARD

In this ERISA action, the Court sits as the trier of fact tasked with resolving factual disputes, weighing the credibility of the evidence and deciding the disputed legal issues between the parties. *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, Civ. A. No. 05–1549, 2008 WL 4922107, at *4 (W.D. Pa. Nov. 13, 2008), *aff'd*, 618 F.3d 253 (3d Cir. 2010) (The "court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.... The Court is also required to assess the credibility of witnesses to determine whether the movant has demonstrated a factual and legal right to relief by a preponderance of the evidence."). The Court's credibility determinations are entitled to significant deference. *See VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282-83 (3d Cir. 2014) (quoting *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156–57 (3d Cir. 2010) ("To the extent that the District Court's conclusions rested on credibility determinations, our review is particularly deferential.")). "A finding of fact is clearly erroneous when it is 'completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.'" *Id.* at 283 (quoting *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004)). The Court's legal conclusions are reviewed de novo. *Id.* at 282-83 (citing *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009)).

With these standards in mind, the Court now makes the following findings of fact and

conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 52.

III. FINDINGS OF FACT

A. *Credibility Findings*

The record before the Court consists of twenty-two joint exhibits, all of which were stipulated by the parties and admitted by the Court, as well as the testimony of six witnesses, including William and Lisa. (*See* Docket No. 91; Exs. 1-22). As a general matter, the Court found the testimony of the disinterested witnesses, i.e., William's former lawyer, James Paulick, Esq., his sister, Lori Gilbert; Lisa's neighbor, Stuart Shugerman; and her friend, Nancy Zewe, to be credible. *See VICI Racing, LLC*, 763 F.3d at 282-83. With respect to the Schwartzmillers, based on their appearance and demeanor and the other evidence of record, the Court finds that Lisa's testimony was more credible and accepts her version of the disputed events. *See id.* The Court accepts portions of William's testimony concerning his background and some aspects of their relationship but holds that Lisa was more credible regarding the most pertinent disputes in this matter, i.e., William was aware of the couple's divorce in 1992 and was a party to their common law remarriage in October of 1993. *See id.* Among other things more fully described below, William demonstrated a lack of candor at times when it would benefit him financially, including stating that he was "divorced" on a September 11, 2014 disability application with the Pension Fund at a time he believed he was still married to Lisa so that he would receive increased disability payments and a larger lump sum payment for retroactive benefits. (Docket No. 91 at 25-29, 92; Ex. 8); *see also Bennun v. Rutgers State University*, 941 F.2d 154, 179 (3d Cir. 1991) (quotation omitted) (The Court may "assess credibility in light of the maxim, falsus in uno, falsus in omnibus ... defined as 'false in one thing, false in everything.'"). His recollection of certain events was also

unclear, uncorroborated by other evidence, inconsistent and implausible. *Id.*

## B. Early Years

William is currently 58 years old and approximately two years older than Lisa. (Docket No. 91 at 8; Ex. 1). Both are high school graduates, (William, Keystone Oaks in 1979; Lisa, Baldwin in 1981), who entered the workforce after graduation rather than pursuing higher education. (Docket No. 91 at 74-75, 161, 196). William joined an apprenticeship program with the Carpenters' Union in 1980, completed the 4-year program and then worked as a union carpenter for several decades. (*Id*. at 8-9). On April 1, 1981, he filled out a medical identification card seeking medical benefits for himself through the Carpenters' Union stating that he was single at the time. (*Id*. at 84; Ex. 6). In October of 1981, Lisa started working at a consulting firm, William M. Mercer, where she worked as an employee benefits specialist until 1998. (*Id*. at 166). Lisa initially had her own benefits through this employment. (*Id*. at 23-4).

The couple was married on June 7, 1986 during a wedding ceremony at St. Paul's Monastery. (Docket No. 91 at 11-12, 168, 202-03; Ex. 1). A reception followed at the Bradley House in Whitehall. (*Id*. at 144, 203). William's sister, Lori and Lisa's friend, Nancy, attended the wedding. (*Id*. at 144). William and Lisa exchanged wedding rings at the service and wore them as a symbol of their marriage. (*Id*. at 172). They moved in together at an apartment on Greenbriar Drive in Greentree. (*Id*. at 144). While living at the apartment together in November of 1989, they had a son, Clayton. (*Id*. at 144, 168). William was 28 years old and Lisa was 26 years old when Clayton was born. (Ex. 1).

## C. Separation and Divorce

The couple separated initially in early 1990. (Docket No. 91 at 13, 168, 187). Lisa testified that William developed an addiction to alcohol and drugs and that she could not manage his

problems on top of having a young child and a full-time job. (*Id*. at 168, 203). As a result, she kicked him out of the apartment in March of 1990 and changed the locks on the doors. (*Id*. at 160-61, 168, 203). William acknowledged having an alcohol and drug problem, as well as related criminal charges for driving under the influence and possession of controlled substances. (*Id*. at 78-9). In the fall of 1990, William's parents staged an intervention and Lisa participated in same. (*Id*. at 160, 168-69, 205). William then went to rehab and started attending Narcotics Anonymous meetings. (*Id*. at 205). He moved back into the apartment with Lisa and his son for a time. (*Id*. at 169, 205). However, Lisa kicked William out again after he was unable to remain clean and sober. (*Id*.).

During the separation, Lisa and Clayton continued to live at the Greenbriar Drive apartment. (Docket No. 91 at 78, 81, 205). According to Zewe, this was a very difficult time for Lisa mentally, emotionally and financially. (*Id*. at 160-61). Lisa obtained an order for alimony and child support against William. (*Id*. at 198-199). While William had an attorney represent him in those Family Court proceedings, he never paid any alimony or support which was ordered by the Court. (*Id*. at 170). Zewe and other friends provided support to Lisa by purchasing her diapers and other items she needed to care for her son. (*Id*. at 152-53, 161). William testified that during this time he lived at several different locations, including apartments in Crafton, Sheraden, and East Carnegie. (*Id*. at 76-77). His sister, Lori, noted that William also lived in Florida for part of 1992. (*Id*. at 102-03). In 1991, Lisa retained counsel and initiated a divorce action against William in the Court of Common Pleas of Allegheny County. (*Id*. at 14-15, 76, 185). William admitted that he was served with certain of the divorce papers. (*Id*. at 15-16, 75-76). He did not retain counsel but "signed off" on the divorce papers provided by Lisa's attorney. (*Id*. at 16). He took no additional action related to the divorce. (*Id*.). A divorce decree was issued by the Hon.

Lawrence Kaplan of the Court of Common Pleas dated September 23, 1992 stating that:

> [t]he bonds of matrimony between Plaintiff and Defendant are hereby dissolved for the reason that the marriage of the Plaintiff and Defendant is irretrievably broken.
>
> Any existing spousal support order shall hereinafter be deemed an order for alimony pendente lite.
>
> The Court hereby retains jurisdiction of any claims raised by the parties to this action for which a final Order has not yet been entered.

(Ex. 5). After the divorce, Lisa stopped wearing her wedding ring and spoke to Zewe about the fact that the divorce was finalized. (*Id*. at 149, 172). She also told William's sister Lori Gilbert that they were divorced. (*Id*. at 103-04). William testified that he never received a copy of the divorce decree but believed at the time that the divorce was final. (Docket No. 91 at 15-16). Indeed, he stated that he was "divorced" on an employee identification card dated November 16, 1992 when he applied for medical benefits from the Carpenters' Union. (*Id*. at 17-18; Ex. 6). Upon signing the form, William certified, in relevant part, that "I, the undersigned, do hereby certify that the Information herein is true and correct and also hereby revoke any and all prior designations of beneficiary heretofore made pursuant to the Pension, Medical and Savings Funds or any of them." (Ex. 6).

### D. The Schwartzmiller's Reunion

In the spring of 1993, William started calling Lisa and told her that he wanted to get back together and to be her husband and Clayton's father. (Docket No. 91 at 146, 149, 170). They continued talking and began seeing more of each other over the next few months. (*Id*.). Around the same time, Lisa employed Zewe's mother as her real estate agent and purchased a home on Blue Jay Drive in Scott Township. (*Id*. at 146, 159). In October of 1993, William and Lisa agreed to get back together and to live together as a family in the new home. (*Id*. at 170).

William and Lisa provided divergent narratives as to the circumstances leading up to their reunion. As noted, the Court credits Lisa's version. *See VICI Racing, LLC.*, 763 F.3d at 282-83. William incredibly claimed that: he and Lisa did not discuss their marital status before he rejoined the family; she placed no conditions on him regarding marital status; and later told him that the divorce was not finalized. (Docket No. 91 at 60, 68-9). He also unbelievably testified that he did not intend to be married to Lisa when he moved in with her and Clayton on Blue Jay Drive and did not treat Lisa as his spouse at that time. (*Id*. at 69-71). His testimony on these points was not corroborated by any other contemporaneous evidence. (*Id*.). In contrast, Lisa offered consistent testimony at her deposition and the hearing which was corroborated by Zewe and Gilbert as well as the totality of the circumstances.

At her deposition, Lisa testified that she and William had a discussion prior to reuniting which was not witnessed by anyone else. (Docket No. 91 at 129-30). She did not recall the exact date of the conversation or the specific words exchanged but explained that she would not have gotten back together with William without discussing the status of their relationship. (*Id*.). She emphasized that "[w]e got remarried when we got back together. He asked to come back into our lives as father and husband and I accepted him into that, and we proceeded as a married couple." (*Id*. at 130). She candidly admitted that she did not know if she and William had ever specifically discussed a "common law marriage." (*Id*. at 130-31).

Lisa explained at the hearing that she discussed the divorce with William and asked him how things would be different going forward to which William responded that he wanted to be her husband and Clayton's father, as well as that "he was changing, he was going to change." (Docket No. 91 at 171). On cross-examination, Lisa became emotional and told the Court that the years with William "were extremely difficult" and that she would not have taken him back and told him

that they were not divorced. (*Id*. at 182-83). However, she accepted his proposal and took him back, he moved into the Blue Jay Drive house, they started wearing their wedding rings as they had before and began once again living as husband and wife. (*Id*. at 170-72, 194-95).

Zewe likewise testified that she discussed the divorce with William a few days after the closing on the Blue Jay Drive house and had the conversation with him out of concern for her friend. (Docket No. 91 at 147-48). Zewe described how William charmingly persuaded her that he loved Lisa, he was going to be a better husband and that they were going to be a family again. She added that "he was so happy. And I saw – I saw it in his eyes and he was - - I was sold. I was on board. I was team Bill. And from that moment on, I - - I was 100% on board with this [reunion]." (*Id*. at 148). William's sister, Lori Gilbert, stated that Lisa told her that she was divorced at some point in the past and both she and William acknowledged that his marital status was a "running joke" on their side of the family in the following years. (*Id*. at 66, 95-96, 102-05).

Shugerman described how William introduced Lisa as his wife after they moved across the street from him on Blue Jay Drive noting that his own wife and William knew each other from high school. (Docket No. 91 at 133). Lisa recalled the interaction similarly and added that William would introduce her as his wife to others when they were "out and about" in the community as well. (*Id*. at 171-72). William admitted that he "probably" introduced Lisa as his wife to neighbors but claimed unconvincingly that he did so because they had moved in together with a child and did not want to be judged by his neighbors. (*Id*. at 70). The Court also credits Lisa's testimony over William's version and finds that Lisa did not tell William that the divorce was not finalized during this time period.

*E. Subsequent Years*

Following the couple's reunion in October of 1993, William continued working for the

carpenters' union and Lisa stayed in her position at Mercer. (Docket No. 91 at 8-9, 23-4, 84, 166; Ex. 6). As before, Lisa had her own benefits from her employment at Mercer and William had benefits through the union. (*Id.*). Shortly thereafter, the family grew with the addition of two more children including a daughter, Jessica, who was born on June 16, 1995, and a son, Jacob, who was born on November 9, 1997. (Ex. 1). Several months after Jacob's birth, William took a higher paying job with his parents' real estate business and Lisa left her position at Mercer to take on the role of being a stay-at-home mother caring for the couple's three children. (Docket No. 91 at 63; 160; 166-67; 201-02; 206). On February 16, 1998, William submitted an updated employee identification card to the Carpenters' Union stating that he was married, identified Lisa as his wife and claimed benefits for the entire family of five. (Ex. 6). He once again certified that this information was "true and correct" and revoked his prior designations of beneficiaries with the Pension, Medical and Savings Funds. (*Id.*).

The exhibits admitted at the hearing further demonstrate that the Schwartzmillers lived as a normal married couple for many years following their reunion until they separated again in 2010. To this end, William sent Lisa various greeting cards, birthday cards, and holiday cards addressing Lisa as his "wife" and in one instance "To the woman I'm so glad I married." (Docket No. 91 at 57-58; Ex. 7). The couple filed joint state and federal tax returns between at least 1999 and 2015. (Docket No. 91 at 58; Ex. 7). As part of his real estate business, William entered into various agreements, mortgages, notes and other legal documents identifying himself as married and residing at the couple's Blue Jay Drive address. (*Id.*). The couple also jointly took actions to support the real estate business including taking out a line of credit on the house and incurring credit card debt. (*Id.* at 206-08). Lisa assisted in the business in various ways, i.e., writing letters to tenants seeking unpaid rent; cleaning apartments; and landscaping. (*Id.* at 167). However, she

asserted that they did not have health insurance during this period of time.  (*Id*. at 206).  William's real estate business ended around 2007 with all of the real estate holdings being subsequently sold or subject to foreclosure and the couple saddled with credit card debt and outstanding tax obligations.  (*Id*. at 206-08).  The failure of the business resulted in William returning to work as a union carpenter and he then submitted another employee identification card on March 19, 2008 which contained the same information certifying that he was married, identifying Lisa as his wife, and seeking benefits for her and the three children.  (*Id*. at 26-27, 167; Ex. 6).

### F.  The Couple's Separation & William's Disability Benefits

The couple's relationship problems resulted in them permanently separating in 2010 at which time William left their residence on Blue Jay Drive and moved into a trailer in Butler County.  (Docket No. 91 at 25-26, 34, 58, 167).  Lisa then started cleaning houses to support herself and their children.  (*Id*. at 166, 197).  William was laid off from his last carpentry job in 2011, suffered a stroke in 2012 and has not worked since that time.  (*Id*. at 9-10).

Since William was unable to work following his stroke, he pursued disability benefits.  (Docket No. 91 at 9, 27).  The Pension Fund provides a disability pension to participants who are awarded Social Security disability insurance benefits ("SSI"), so William first filed an application for SSI.  (*Id*. at 9-10).  In 2014, William's application for SSI was approved after a lengthy two-year process which required him to retain counsel and attend a hearing before an administrative law judge.  (*Id*. at 10, 27).  Having obtained the prerequisite SSI benefits, William applied for his disability retirement with the Pension Fund on September 11, 2014, stating on his application that he was "divorced" and seeking a single life pension of $1,294.40 per month for the remainder of his life.  (*Id*. at 28-29; Ex. 8).  The form clearly states "IF YOU ARE MARRIED AND DO NOT ELECT THE REGULAR JOINT & SURVIVOR OPTION, YOUR SPOUSE MUST SIGN THIS

APPLICATION." (Ex. 8). William testified that he believed he was married to Lisa at the time he filled out this application but checked the box indicating he was "divorced" because he had not been with Lisa for a few years and "just wanted my [single life annuity]." (Docket No. 91 at 29, 61-62). He admitted that he lied on the form but stated he did so because he wanted the higher payments provided by the single life annuity. (*Id*. at 62). After William submitted the application, a representative of the Pension Fund told him that he needed to provide a divorce decree in order to prove that he was divorced but if he did so they would approve his application. (*Id*. at 29-30). William did not discuss the rejected application with Lisa prior to or after its submission. (Docket No. 91 at 61). Naturally, this application, which was neither signed by Lisa as his spouse nor supported by a divorce decree, was rejected by the Pension Fund. (*Id*. at 61; Ex. 8).

Approximately one month later, on October 10, 2014, William filled out another employee identification card and once again certified that he was married and listed Lisa as his wife and primary beneficiary. (Ex. 6). William then approached Lisa regarding his renewed pension application. (Docket No. 91 at 174). They met in person and an argument ensued. (*Id*.). Lisa would not agree to a single life annuity because they were still married which resulted in William becoming "very, very angry" and telling her that she was going to die before him. (*Id*.). She said he was being ridiculous. (*Id*.). The conversation ended with William leaving the application with Lisa for a week so that she could think about what to do. (*Id*.). At a follow-up meeting, William and Lisa agreed to choose a seventy-five percent (75%) pop-up joint and survivor annuity which would result in William receiving $944.59 monthly but the full annuity of $1,294.40 if Lisa preceded him in death. (*Id*. at 32-33, 174; Ex. 9). If William died first, Lisa would be entitled to a monthly annuity of $708.44. (*Id*.). Lisa believed this was a "fair" choice and William reluctantly agreed. (*Id*.). The application was signed by both Lisa and William on December 11, 2014 and

identifies William as married and Lisa as his wife and beneficiary.  (Ex. 9).  A notation on the bottom of the application form states "THE OPTION YOU ELECT BECOMES IRREVOCABLE ONCE YOUR MONTHLY PENSION BENEFITS HAVE COMMENCED."  (*Id*.).  This application was approved by the Pension Fund and William began collecting his monthly pension payments in addition to his social security benefits.  (Docket No. 91 at 33).

### G.  Subsequent Communications

Despite their separation, William and Lisa continued to communicate with each other via text message concerning their children and certain financial matters.  (Exs. 11-14).  The evidence presented, including witness testimony and text communications, reveal ongoing animosity between the pair regarding these issues and William's considerable angst toward Lisa regarding his disability pension.  (*Id*.). On March 2, 2015, Lisa asked for information from William in order to file their joint tax returns and a financial aid application for one of their children and they engaged in another argument.  (Ex. 11).  William suggested that he did not see how filing the tax returns jointly had anything to do with the financial aid causing Lisa to comment why he could "never cooperate" and William to counter that he "lost $10,000 and $350 a month because of the option [Lisa] wanted on [his] pension,"  among other things, and that he wanted to "do [his] own taxes."  (Ex. 11).  This dispute was apparently resolved as Lisa suggested because the couple subsequently filed joint federal tax returns for the 2014 and 2015 tax years.  (Ex. 7).

Another text exchange months later, on January 3, 2017, was considerably more hostile, with both Lisa and William engaging in name calling and using expletives toward each other.  (Ex. 12).  Relevant to these proceedings, William threatened divorce stating that "[m]y attorney will be in touch about the divorce and division of common assets."  (*Id*.).  He added that he wanted them to "[s]ell the house ….. pay off leins (sic) and we both go our ways" and his attorney "WILL make

it happen!." (*Id*.). He complained that "I live in a piece of shit trailer! …. im (sic) screwed out of $350+ every month cause of you fuckin with my pension!...then i pay $200 a month to the irs so they font (sic) take the fuckin house you live in!.....then on top of that,you poison me against my kids and my parents!.....i sm (sic) soooo done!!! Start Packing!" (*Id*.). Lisa retorted calling William and his parents "pieces of shit" and commenting that their "kids have turned out so fantastic. They are loving caring human beings and that's absolutely no thanks to you. It's in spite of you." (*Id*.). She added that he was "worthless." (*Id*.). As to William's pension complaints, Lisa stated "I didn't screw with your pension. You are still married and you have to take a joint and survivor form of payment. You haven't helped us for years and I never ask you for anything. I never bother you except for a few hundred dollars to cover Jakes (sic) excess tuition. I've been paying the line of credit that has an adjustable rate which keeps going up and it will be due in full in three years. So don't tell me how screwed you are." (*Id*.).

### H. Investigation of Prior Divorce

William later complained to his sister, Lori Gilbert, about his financial circumstances including that his monthly pension payments were lower because of Lisa's insistence that he was not entitled to a single life annuity due to their marriage. (Docket No. 91 at 102-03). They agreed that this conversation took place at some point during the holiday season at the end of 2016 or beginning of 2017. (*Id*.). Gilbert testified that she told William that she thought that he and Lisa were divorced and suggested that he investigate whether they were divorced or not. (*Id*.). Gilbert recalled Lisa telling her that she and William had been divorced in the past when they were close and both having marital problems. (*Id*.). Gilbert explained that William seemed surprised by this revelation. (*Id*.).

William sought the assistance of a lawyer to investigate his marital status and engaged

James Paulick, Esq. for this purpose, after being referred by a friend. (Docket No. 91 at 41; Ex. 19). During an initial consultation on January 19, 2017, William explained the circumstances to Paulick, who testified that William seemed to be genuinely unsure of whether he was married or not. (Docket No. 91 at 121). However, the initial scope of the engagement was limited to Paulick conducting "divorce filing research" or, as William understood it, Paulick "was going to have somebody go to the courthouse and search the records to see what was recorded." (*Id*. at 42). Paulick successfully obtained the certified divorce decree from the Court of Common Pleas, which he forwarded to William under correspondence dated January 26, 2017. (*Id*. at 41-43; Exs. 5, 15). After William received the certified divorce decree, he went to the Pension Fund office and presented it to a staff member, expecting that they would allow him to change his form and claim a single life annuity with the higher payments to which he believed he was entitled, retroactive to the date of his retirement. (Docket No. 91 at 45-46). Hence, he was seeking both an increase in the monthly pension payments and a lump sum amount for retroactive benefits. (*Id*. at 45). However, the staff member advised William that his presentation of the divorce decree created legal issues with the Medical Plan because he had been claiming medical benefits for Lisa as his wife for decades but was now claiming that they had been divorced since 1992. (*Id*. at 46-47).

William returned to Paulick for additional advice and they had a conference call on February 24, 2017. (Ex. 20). Approximately two weeks later, on March 6, 2017, Paulick contacted Pension Administrator Jim Klein on William's behalf and followed-up with William to discuss the positions of the Pension Fund and Medical Plan with him. (Ex. 20). Specifically, the Pension Fund was unwilling to revise his pension to a single life annuity and the Medical Plan now believed that he had wrongly claimed medical benefits on Lisa's behalf. (Docket No. 91 at 121-24). A few days later, on March 9, 2017, William sent Lisa a lengthy text message:

> The carpenters (sic) union got a certified copy of our recorded dicorce (sic) decree from 1992 and they are suing me for all the medical benefits paid on your behalf since then. Its tens of thousands of dollars and gonna cost meany (sic) thousands in attorney fees. I can not sign the letter you sent me. I dont (sic) want to talk about it now please. Im (sic) sick… i dont (sic) know what to do.

(Docket No. 91 at 47-48; Ex. 13). Lisa gave an extensive response two and a half hours later:

> I don't want to talk either. But I don't remember that divorce ever being finalized. I don't have any decree. We got back together shortly after it was filed. I worked and had my own health benefits through my company for us which I used for myself and the kids until I quit in 1997. You worked for your parents that year and went on your own with the real estate business in 2000 or 2001. We went without coverage until you started working for mbm in 2008 and got laid off in 2010. You paid out of pocket for health benefits through cobra for six months after that and then we went without coverage again. When you worked for the carpenters union, money was taken out of your pay check to pay for health benefits. It wasn't free so I don't know what they're talking about. I don't know what else to say but that I'm tired just as you are and I'm sick of everything and all the problems.

(Ex. 13). She followed up in approximately three and a half hours with additional information:

> If we were unaware of the divorce decree, we lived as a married couple and have proof as such. I just researched Pennsylvania's common law marriage rules and we certainly fit them. Pennsylvania stopped recognizing common law marriage in 2005, but they recognize couples living as married prior to the change in the law. They grandfather those couples in. Don't waste your money on attorneys right now. They'll take you for a ride and won't solve anything.

(Ex. 13).

Lisa credibly testified that William's texts caused her to panic and that she could not at that moment remember the status of the divorce some twenty years later. (Docket No. 91 at 183). She explained the difficulties in their relationship and how every bad decision made by her spouse had affected her causing her to believe that she was going to be sued as well, although William's text

did not state that specifically. (*Id*. at 183-84). She also pointed out that William did not disclose to her that he had provided the divorce decree to the Pension Fund himself or why he had done so, i.e., he made a second attempt to get a single life annuity without obtaining her consent. (*Id*. at 186-87). The thrust of her explanation for the texts was that she was seeking some type of a solution to yet another problem caused by William. (*Id*. at 187). Overall, the Court credits her explanation.

## I. *Appeals and Lawsuits*

William's pursuit of a retroactive single life annuity continued and Paulick drafted a letter on his behalf to Pension Fund Administrator Klein dated March 31, 2017. (Docket No. 91 at 53-55, 121-22; Ex. 10). In the letter, Paulick references his prior discussion with Klein regarding a claim against the Pension Fund for "monies [William] believes are owed to him now that he has discovered that he was divorced at the time of applying for his benefits." (Ex. 10). He attached the 1992 divorce decree and claimed a total cash payment of $19,239.55 representing the difference between the benefits he received and those he believed he was entitled under a single life annuity and to change his election from the 75% pop-up joint and survivor annuity to the single life annuity. (*Id*.). The Pension Fund denied William's claim in an April 7, 2017 letter sent by its counsel JoAnne Mineweaser, Esq. of Tucker Arensburg. (Ex. 22). The letter detailed how to appeal the decision. (Ex. 22). Paulick testified that the denial was "expected." (Docket No. 91 at 12-23). However, since these types of ERISA claims were not Paulick's area of expertise, he worked with William to find him new counsel to represent him in the appeal and his current counsel was engaged shortly thereafter. (*Id*. at 54-55, 123-24).

On August 15, 2017, William filed an appeal, through counsel, to the Pension Fund claiming that Lisa had deceived him regarding the finalization of the divorce. (Ex. 16). He argued

that Lisa was never qualified or eligible to be a beneficiary of the 75% pop-up joint and survivor annuity and, as before, argued that he was entitled to retroactive benefits and a change of the election to the single life annuity. (*Id.*). While the appeal was pending, the Medical Plan sent correspondence to William dated October 11, 2017, through its own counsel, Stephen J. O'Brien, Esq., seeking reimbursement for medical benefits provided to Lisa between 1992 and 2012. (Ex. 17). The Medical Plan demanded a lump sum payment of $52,890.78 computed by multiplying the number of months coverage was provided by the COBRA rate for the plan during the relevant years and threatened a lawsuit if the payment was not made. (*Id.*). William did not respond to this communication and the Medical Plan filed the instant lawsuit against William and Lisa on November 6, 2017. (*See* Docket No. 1). One week later, the Pension Fund denied William's appeal in another letter from attorney Mineweaser. (Ex. 18). In its specific reasons for denial, the Pension Fund noted that section 5.10(f)(2) of the Plan prohibited William from changing the election of a 75% pop-up joint and survivor annuity or his designation of Lisa as a beneficiary after he started receiving benefits payments. (*Id.*). The Pension Fund added that if the election were changed that Lisa may have a claim against it and that she "could assert a claim for survivor benefits based on a common law marriage theory." (*Id.*). The letter continued:

> In Pennsylvania, there is a rebuttable presumption in favor of a common law marriage based on sufficient proof of cohabitation and reputation of marriage prior to January 2, 2005 where the parties are otherwise disabled from testifying regarding words of present intent. Since Mr. Schwartzmiller and Lisa Schwartzmiller cohabited, had children, and held themselves out as married subsequent to the divorce in 1992 and prior to January 2, 2005, Lisa Schwartzmiller would likely be able to meet the presumption of a common law marriage, absent any testimony by Mr. Schwartzmiller to the contrary.

(*Id.*). The letter noted that there were no additional levels of appeal but that William could file an action against the Pension Fund under ERISA if he disagreed with this decision. (*Id.*). He did not

do so immediately but waited until the initial action brought by the Medical Plan progressed through discovery and was ripe for a disposition on the merits. On March 19, 2019, William filed a separate lawsuit against the Pension Fund, and the two cases were consolidated for proceedings before this Court. *See William Schwartzmiller v. Greater Pennsylvania Carpenters' Pension Fund and Carpenters' Combined Funds, Inc.*, Civ. A. No. 19-310, Docket No. 1, (W.D. Pa. Mar. 19, 2019).

### J. Present Status of the Parties

At present, Lisa resides at the Blue Jay Drive residence and continues to support herself cleaning houses. (Docket No. 91 at 165-66, 197, 208). There are still outstanding IRS liens and other financial obligations which she pays when she can. (*Id.* at 206-08). William has contributed some toward these debts but not enough in her view. (*Id.*). Lisa does not yet qualify for retirement benefits. (*Id.* at 166, 197). William has moved to Naples, Florida where he lives on a houseboat and collects SSI and his disability pension. (*Id.* at 8, 33-35, 88-89). Their children have grown and remain close to their mother. (*Id.* at 82, 165-66). However, there is a disconnect between the children and their father. (*Id.* at 127). From what the Court observed, Lisa and William were civil toward each other during the hearing but there is clearly animosity between them regarding financial and family matters. None of the children participated in these proceedings.

As with their positions in this litigation, Lisa believes that they remain married while William contends that they are divorced. (Docket No. 91 at 96-97). Neither Lisa nor William have initiated another divorce proceeding and they are apparently awaiting a decision by this Court on their marital status. (*Id.* at 71). However, William threatened to file for divorce while this case was pending. To this end, in a series of text messages to Lisa dated August 1, 2018, he wrote the following:

When I have to file for divorce real soon ….we WILL BE selling
the house on blue jay

…

Funny how you always gotta list all the things you do but you never
appreciate that I been paying irs monthly, spent $6000 to put a roof
on the house, made many tuition payments last year and now
spending thousands on attorney fees because of your fucking
greed!......I walked away from the house not asking for nothing
but,no (sic) that's not good enough for you.

…

You better sign off agreeing that divorce was final or you gonna
have problems like you won't believe……I'm done….no more mr
nice guy…..I'm tired of getting screwed all my life

(Ex. 14).  William testified that he only made these statements in response to a claim by Lisa that

they were still married but did not offer the rest of the text exchange or any corroborating evidence

of Lisa's remarks.  (Docket No. 91 at 96-97).  In any event, William's August 1, 2018 statement

that he needed to file for divorce was consistent with an earlier text message he sent to Lisa on

January 3, 2017 which occurred prior to his visiting attorney Paulick, obtaining the divorce decree,

or any of this litigation ensued.  (*See* Ex. 13 ("My attorney will be in touch about the divorce and

division of common assets.")).  Hence, the Court does not credit his explanation.

### K. *Relevant Procedural History*

After the consolidation of the two cases, the parties filed a Stipulation on July 31, 2019 "to

narrow the issues and streamline this consolidated case."  (Docket No. 75 at ¶ 8).  They agreed to

the Court convening an evidentiary hearing at which time Lisa and William would present

evidence as to the common law marriage dispute for the Court's resolution in a bench trial.  (*Id*. at

¶ 9).  All parties to this action, including the Medical Plan and Pension Fund, agreed to be bound

by this Court's decision and to not appeal same.  (*Id*. at ¶ 12).  They further agreed that if the Court

determines that there was no common law marriage, the parties will make efforts to amicably

resolve the disputes with the Pension Fund and the Medical Plan prior to seeking additional rulings by the Court on ERISA issues. (*Id*. at ¶ 13). Finally, they have stipulated that if the Court finds that there is a common law marriage, that the Medical Plan will dismiss the action against Lisa and William, with prejudice and William will dismiss the action against the Pension Fund, with prejudice. (*Id*.).

As noted, the Court convened an evidentiary hearing on November 5, 2019. (Docket No. 89). The official transcript of same was filed on December 5, 2019. (Docket No. 91). The Schwartzmillers submitted proposed findings of fact and conclusions of law on January 29, 2020, February 7, 2020 and February 11, 2020. (Docket Nos. 94; 98; 99). They then submitted responses on February 18, 2020. (Docket Nos. 100; 101). In accordance with the parties' Stipulation, the Medical Plan and Pension Fund have not made any submissions. Accordingly, this matter is fully briefed and is now ripe for disposition.

## IV. DISCUSSION

At the outset, the Court agrees with the parties that Pennsylvania law governs the disputed legal issue of whether the Schwartzmillers formed a valid common law marriage. *See e.g., Murray v. IBEW Local Union No. 98 Pension Plan*, Civ. A. No. 10-3852, 2011 WL 1883189, at *7 (E.D. Pa. May 17, 2011) (noting in ERISA action that "the Court must consider the Pennsylvania law regarding common law marriage"). "Historically, Pennsylvania defined marriage as 'a civil contract made between parties with the capacity to so contract.'" *In re Estate of Carter*, 159 A.3d 970, 974 (Pa. Super. Ct. 2017) (quoting *In re Estate of Garges*, 474 Pa. 237, 378 A.2d 307, 308 (Pa. 1977)). There are two acceptable types of marriage in Pennsylvania: ceremonial and common law. *Id*. However, the Commonwealth has abolished common law marriages entered into on or after January 2, 2005 and only recognizes common law marriages formed prior to that date. *See*

23 Pa.C.S. § 1103; *see also In re Estate of Fritz*, 2020 WL 211525, at *3 (Pa. Super. Ct. Jan. 14, 2020) (citing same).

On June 7, 1986, the Schwartzmillers entered into a ceremonial marriage during a service at St. Paul's Monastery but that marriage ended when Judge Kaplan issued the divorce decree on September 23, 1992. (Exs. 1, 5). At issue here is whether the Schwartzmillers subsequently created a valid common law marriage.

> To prove the existence of a common law marriage, a party must generally show that the couple came to "express agreement" through words spoken in the present tense – or *verba in praesenti* – "uttered with a view and for the purpose of establishing" the marital relationship. [*Staudenmayer v. Staudenmayer*, 714 A.2d 1016, 1020 (Pa. 1998)] (citation omitted). "The requirement of 'words in the present tense' is designed to ensure the existence of a present intent to marry, like the present intent established in a formal wedding ceremony, rather than a plan to marry in the future or a claim to have wed in the past." *Estate of Carter*, 159 A.3d at 979. "The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time." *Staudenmayer*, 714 A.2d at 1020; *see also Estate of Carter*, 159 A.3d at 979.

*Estate of Fritz*, 2020 WL 211525, at *3. "In particular, words of taking or explicit performative utterances, such as 'I take you to be my wife' or 'I hereby marry you' are unnecessary. All that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time." *In re Garges' Estate*, 474 Pa. 237, 241–42, 378 A.2d 307, 309 (Pa. 1977) (footnotes omitted). "Stated differently, 'common law marriage will still be recognized without use of *verba de praesenti*, where the intention of the parties[,] as expressed by their words, is that they were married.'" *Estate of Carter*, 159 A.3d at 979 (quoting *Cann v. Cann*, 632 A.2d 322, 325 (Pa. Super. Ct. 1993)).

Because William and Lisa both testified at the hearing, this is not a case where a rebuttable presumption may be utilized to establish the existence of a common law marriage through

circumstantial evidence of cohabitation and reputation of marriage. *See Staudenmayer*, 714 A.2d at 1021. With that said, "when assessing claims of common law marriage, context matters," and other evidence beyond the parties' exchange of words may be used to show their present intent to form a common law marriage. *Estate of Carter*, 159 A.2d at 980-81. Such evidence may include, among other things, "the exchange of rings," *id.* at 981; "constant cohabitation and reputation of marriage," *Staudenmayer*, 714 A.2d at 1021; the filing of joint tax returns with sworn statements claiming to be married, *see Com. ex rel. McDermott v. McDermott*, 345 A.2d 914, 552 (Pa. Super. Ct. 1975); participation in joint financial matters and real estate transactions as well as other acts typically attributed to married couples such as honeymoons and anniversary celebrations, *see Estate of Carter*, 159 A.2d at 981.

The parties initially debate whether the Court should view Lisa's claim of a common law marriage as "disfavored" or "favored" and/or the extent of her burden and quantum of evidence required to support it under the prevailing caselaw from the Supreme Court of Pennsylvania. (*See* Docket Nos. 94, 99-101). Lisa advocates that the better precedent is *Wagner's Estate*, 159 A.2d 495 (Pa. 1960) and its progeny holding that a common law remarriage by a divorced couple is favored under the law and may be shown with lesser proof. (Docket Nos. 94, 99-100). The reasons cited for favoring such claims arise from traditional notions that a man and woman should not live together prior to marriage or conceive or raise children outside of wedlock and the desire to keep families together. (*Id.*). William maintains that the Court should follow *Staudenmayer*, which he believes requires the Court to view Lisa's claim with hostility and to meet a heavy burden to produce clear and convincing evidence of the parties' exchange of *verba in praesenti*. (Docket Nos. 98, 101). The stated rationale for disfavoring claims of common law marriage is the possibility that such claims may be fraudulently made for pecuniary gain, particularly in disputes

over a decedent's estate.  (*Id*.).  He also posits that the traditional notions cited in *Wagner's Estate* for lessening the burden in remarriage cases are no longer applicable given subsequent changes in societal views.  (*Id*.).

Having considered the parties' positions in light of the evidence of record, the Court finds that the result of this particular matter is not controlled by whether common law marriages or remarriages are favored or disfavored under the law.  *See Estate of Carter*, 159 A.2d at 980 ("when assessing common law marriage, context matters, and general notions of hostility need not always dictate the outcome.").  Rather, this is a straightforward credibility contest which Lisa plainly won because her testimony was credible and William's was not.  *See Travelers Cas. & Sur. Co.*, 609 F.3d at 156-57.  Indeed, the evidence presented here is more than sufficient to meet the higher standards advocated by William, i.e., Lisa demonstrated by clear and convincing evidence that she and William entered into a valid common law marriage in October of 1993. *See Staudenmayer*, 714 A.2d at 1020.  The Court reaches these conclusions for several reasons.

First, the credible evidence shows that William was aware that his divorce with Lisa was finalized in 1992, despite his incredible testimony to the contrary which is inconsistent with the other evidence in the record.  (*See e.g.*, Docket No. 91 at 15-18; Ex. 6).  To this end, William was personally served in August of 1992 with certain pleadings from the divorce action including a Notice of Intent to File Divorce Decree and testified that he signed the divorce papers provided to him by Lisa's attorney.  (Exs. 1-4; Docket No. 91 at 71-72).  His contemporaneous knowledge of the divorce is clearly set forth in his November 16, 1992 certification to the Medical Plan stating that he was divorced on an employee identification card.  (Docket No. 91 at 15-18; Ex. 6).  In addition, the Court accepts the testimony of Lisa and her friend Zewe that they had discussed the divorce with William many years prior to these proceedings.  (Docket No. 91 at 147-48, 171).

William and his sister, Gilbert, also acknowledged that his divorce with Lisa was a running joke within his extended family for many years prior to this litigation. (*Id*. at 66, 95-96, 102-105). While Lisa wrote in a March 9, 2017 text message to William that she did not remember if the divorce was finalized, the Court accepts her explanation that she simply did not remember what had occurred in the 25-year old legal case prior to hastily responding to the news that William was being sued for wrongly obtaining benefits on her behalf. (Docket No. 91 at 183-84, 186-87; Ex. 13). William did not present any contemporaneous evidence corroborating his vague and unspecific testimony that Lisa had told him in the past that the divorce had not been finalized and the Court rejects his testimony on this point.

Second, the record contains clear and convincing evidence that Lisa and William had the present intent to form a common law marriage when she accepted his promise to be a better husband and father and he rejoined the family at the Blue Jay Drive house in October of 1993. *See Staudenmayer*, 714 A.2d at 1020. As noted above, "context matters," and the circumstances of the Schwartzmiller's relationship in the years leading up to their reunion were complicated, to say the least. *See Estate of Carter*, 159 A.2d at 980. In this regard, they were married in a formal ceremony in 1986 and had a son in November of 1989 before separating in early 1990. (Docket No. 91 at 11-13, 144, 168, 187, 202-03; Ex. 1). William's behavior and struggles with addictions to alcohol and drugs led Lisa to kick him out of the house twice, with the second time occurring after an intervention and a stint at a rehabilitation center. (Docket No. 91 at 160-61, 168-69, 178-79, 203-05). During this time period, William did little to support Lisa and Clayton financially and even ignored a child support order she obtained against him in Family Court. (*Id*. at 152-53, 161, 170, 198-99). Lisa pursued a divorce action against William, which he did not oppose, and was finalized in September of 1992. (Docket No. 91 at 14-16, 75-76, 185; Exs. 2-5).

These were very difficult times for Lisa, as she emotionally described at the hearing. (Docket No. 91 at 182-83). However, in the spring of 1993, William became clean and sober and romantically pursued Lisa again, with promises to become a better husband and father. (*Id*. at 146, 149, 170). He started to provide some financial support. (*Id*.). William and Lisa began spending more time together throughout the summer months. (*Id*.). Lisa then purchased a home on Blue Jay Drive. (*Id*. at 159). The Court credits Lisa's testimony that she had a conversation with William where he told her he wanted to be her husband and Clayton's father, she accepted, they agreed to remarry and live together as a family in the new house. (Docket No. 91 at 129-31; 170-72; 182-83). The Court also believes Lisa's emotional testimony that she would not have let William back into their lives without his agreement to remarry due to all of the prior difficulties in the relationship. (*Id*.). Once again, William's denials and contrary version are rejected by the Court.

Third, William makes much of Lisa's admission that she cannot recall the exact words exchanged during their discussion, arguing that it is insufficient to meet her burden to establish *verba in praesenti*. (*See* Docket Nos. 98; 101). However, his position elevates form over substance as the caselaw is clear that testimony of the specific words utilized is not required and the Court believes Lisa's testimony more than suffices to demonstrate that the couple had the present intent to remarry in October of 1993. *See Garges' Estate*, 474 Pa. at 241-42 ("All that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time."). Indeed, Pennsylvania courts have upheld common law marriages in similar situations. *See e.g., Estate of Carter*, 159 A.3d at 980-81 (exact words exchanged not summarized by Court but exchange of rings and surrounding circumstances sufficed to demonstrate same-sex couple had present intent to marry); *Garges' Estate*, 474 Pa. at 241-42 (noting that "in *Rosenberger Estate*, 362 Pa. at 155, 65 A.2d at 379, a marriage contract was found where the man gave the woman a ring and said,

'Now you have the ring and you are my wife,' whereupon she replied, 'That is fine. I love it.'");

*Smith v. Smith*, 29 Pa. D. & C.4th 468, 473 (Com. Pl. 1995) ("in late August of 1981, when the parties were discussing reconciliation, George Smith stated to Paula Smith, 'You belong to me. Be my wife. You'll always be my wife no matter what.' Paula Smith then agreed. George Smith's statement indicates that he had a present intention to have Paula Smith as his wife and she agreed to this relationship. These words established a common-law marriage."). Here, William said he wanted to be Lisa's husband and Clayton's father, she accepted, and they formed a common law marriage. (Docket No. 91 at 129-31; 170-72; 182-83).

Fourth, the totality of the circumstances surrounding the Schwartzmiller's reunion and their subsequent activities overwhelmingly demonstrates that they had the present intent to remarry in October of 1993. *See Estate of Carter*, 159 A.2d at 980. To reiterate, after their discussion, William moved into the new house with Lisa and Clayton and they lived together as a family. William and Lisa started wearing their wedding rings again, in the same manner as they had before their divorce. *See Estate of Carter*, 159 A.2d at 981. William introduced Lisa as his wife to friends and neighbors, including Shugerman. (*Id.* at 70, 133, 171-72). The record shows that for the next 17 years, the couple cohabitated and held themselves out as married. *See Staudenmayer*, 714 A.2d at 1021. Among other things, they grew their family with two additional children; identified themselves as married on medical benefits forms, joint tax returns, real estate and other financial records; and celebrated holidays, anniversaries and birthdays as husband and wife. (*See e.g.*, Docket No. 91 at 57-58, 63, 160, 166-67, 201-02, 206-08; Exs. 1, 6-7). Even after separating in 2010, the couple continued to engage in financial activities as a married couple, filing joint tax returns and financial aid for their children's higher education. (*See* Exs. 7, 11). Between 2014 and 2018, William made several statements indicating that he and Lisa were married, including:

certifying they were married on an employee medical benefits form dated October 10, 2014 and his Pension Fund disability form dated December 11, 2014; and threatening to divorce Lisa in January 3, 2017 and August 1, 2018 text messages. (Exs. 6, 9, 12, 14). Finally, and importantly, William lacks credibility because he lied on the initial disability form he filled out with the Pension Fund dated September 11, 2014 by claiming to be divorced in order to obtain a larger lump sum and higher monthly benefits payments. (Ex. 9). He admitted that he believed he was married at the time and did not consult with Lisa about this form. (Docket No. 91 at 29, 61-2).

For all of these reasons, the Court concludes that Lisa met her burden to show by clear and convincing evidence that she and William entered into a common law remarriage in October of 1993. *See Staudenmayer*, 714 A.2d at 1020.

V.    CONCLUSION

Based on the foregoing, the Court holds that the Schwartzmillers formed a valid common law remarriage in October of 1993. An appropriate Order follows.


                                                    *s/Nora Barry Fischer*
                                                    Nora Barry Fischer
                                                    Senior U.S. District Judge

Dated: March 23, 2020

cc/ecf: All counsel of record.